Good afternoon, Your Honor. I'm sorry, I just got let into the meeting room, so I haven't heard anything. We can hear you. Can you hear me? Yes, I can. Okay, you may proceed whenever you're ready. Thank you, Your Honors, and may it please the court. My name is Adam Balatin, and I represent Syed Ahmad, defendant appellant. Today, we're asking Your Honors to reverse the district court's decision below denying our motion to suppress for three reasons. First, the trooper seized Mr. Ahmed when he retained Mr. Ahmed's driver's license and travel document. Second, the trooper had no basis to do so. And third, the trooper prolonged the seizure in order for the canine to arrive. I'd like to begin my discussion this afternoon with whether the trooper seized Mr. Ahmed. And when this court looks at whether a reasonable person Mr. Ahmed's shoes would have not felt free to leave is identified two significant factors. First being whether a trooper or law enforcement officer retains a travel document or identification. And we know that's what happened in this case, because the testimony at the evidentiary hearing, as well as the government's position is very clear. The trooper saw Mr. Ahmed, waved him over, told him that he was working drug interdiction, started asking him questions about where he's going, where he's coming from. And then he asked him, can you please go get your driver's license and rental car agreement. Mr. Ahmed then gave the trooper those documents, the trooper looked them up on the system made sure that Mr. Ahmed did not have any outstanding warrants, or that and that his license was valid, made sure that the rental car agreement also had his name on it. And then instead of immediately returning the documents, Mr. Ahmed, he retained them. And it is that act of the trooper, as this court held in Tyler and Cordell, that effectuated a seizure. And it is that fact that is distinguished, that this court distinguished from other cases like Soto Lopez, where the officers merely glance at the when he had the travel documents and the ID, when was the first consent to search given? The first consent to search was given after the trooper ran the license. And it came back as clear, and then looked at the rental car agreement, saw that he was the name on the rental car agreement was his name. And then he asked only after retaining them, holding on to them. And he never gave the documents back. It happened after. But it looked like from the record and correct me if I'm wrong, that the consent was given shortly after he ran the ID and he was holding on to the rental agreement, but no indication that he wasn't going to give it back. It seems like it all happened very quickly. What I'll say, Your Honor, is that the record shows that he ran those checks. So at the very least, he was holding on to them. And I believe the record has a timeframe of two to three minutes. And what happened in in in Cordell, where the officers approached somebody in the airport, they got their travel documents, started questioning them about the trip. And then they were holding on to the to the ID and the ticket, and then merely passed the ticket over to their partner. That pass can only take a matter of moments. But in that case, the court held that when the officer retained the documents and did not immediately give them back to the defendant, a seizure occurred. And on top of that, Your Honor, we have the additional fact that this circumstance that this court has talked about, and that additional circumstances when an officer relays to a person that they are a suspect or that they are that the officer is conducting an investigation. And what this what the district court talked about, and what the government argued, is that because the officer only said that he's working drug interdiction, that that's different than you're a suspect. But what this court has held, and what this court has stated is that magic words are not necessary. And what we look at is based on the officer's words and actions, whether a reasonable person would have felt as if they are a suspect. And in this case, you have an officer waving Mr. Ahmed over and immediately telling him I'm working drug interdiction. I'd like to ask you some questions. Can you please explain where you're coming from? Why is the RV from Idaho? Okay, why are you not matching the description? Let me see some ID. Let me see the travel documents. I run at that point, a reasonable person in Mr. Ahmed shoes would understand that, yes, I am now the subject, the target of this officer's drug interdiction efforts. So we have a seizure. So what we have to look at is what basis does this officer have? And does those circumstances amount to reasonable suspicion or probable cause? And what we have is they don't. And we know they don't because of the officer's own testimony. He specifically says, all I had was a hunch. This court has time and time again held a hunch is not reasonable suspicion. A hunch is not probable cause. And what the district court below did was they looked at certain circumstances, and they tried to view those in a vacuum. And what this court said in Rodriguez-Escala is that you have to look at additional facts that the officer learned during their investigation that could mitigate or dispel initial suspicions. Now, I'm not conceding that anything the officer observed was warranting of suspicion. But even if this court considers that, the facts that the officer learned immediately afterward dispelled and mitigated all suspicions. First, you have the employee who says, officer, I think these guys are trying to wait you out. Well, immediately after the employee makes this complaint, the officer sees Mr. Ahmed and his passenger leave. And then you have the description and the interaction with the officer. Mr. Ahmed is not trying to avoid him. He's not being nervous. He's not being evasive. He's not sweating. He's not doing anything in the interaction with the officer that would make the officer believe, hey, maybe this guy is doing something wrong. Then you have the officer running the license plate and saying, well, the RV comes back to an elderly white couple. And Mr. Ahmed is middle age and Middle Eastern. Mr. Ahmed, why are you driving this car that you don't match the description of? Well, officer, I have to ask you a question. Yes, Judge. When in the sequence of events does Officer Suttles get out of his police car? Get out of the police car, your honor? No, I would assume. And I think that when you look at the record, it would have to be after he retains the travel documents and asked Mr. Ahmed consent to search, because after that point, he then directs his efforts towards Mr. Osama, who is in the RV. So I would until that time, until that time, the officer is not he's just sitting in his car and he's not blocking the RV, right? He's not blocking the RV, your honor. However, at that point, and at all points, he had Mr. Ahmed's driver's license and rental car agreement. And in Illinois, it is illegal to drive without your license. And you can a reasonable person is not going to be able to leave without his driver's license. But the defendant never never asked, right? He never asked for his license. No, he did not. But the defendant and Tyler and Cordell never asked for their, their documents back either. And in those cases, the mere retention of those documents, whether they ask for them back or not, is a seizure. That's what Cordell was more than just a mere holding on to it in Cordell. The one officer handed the driver's license and the airline ticket to another officer, and then made the statement that they were conducting a narcotics investigation, suggesting they were conducting a narcotics investigation of Cordell. That's a different factual scenario than here. I would say that it's comparable to what happened here, your honor, because as we talked about a little bit earlier, the officer identifies himself and says, I'm working drug interdiction, and then immediately starts directing those drug interdiction efforts to Mr. Ahmed. And this court has said that it's or either announces that he's conducting a drug investigation, or retains the travel document. Well, you've conceded that at the time he told him he was conducting the drug investigation, that that was still consensual. I would disagree, your honor. Because wasn't that early on at their first encounter? I don't read your briefs as arguing that the seizure occurred until the moment that he held on to the the rental agreement. Yes, your honor. And I would say that it's a totality of the circumstances. We're not arguing that by coming up to Mr. Ahmed and saying, I'm working drug interdiction, I'd like to ask you some questions is a seizure. But you have to look at the totality. And the totality is, I'm working drug interdiction. I'd like to ask a moment ago, it was or so that's what confused me that you said that either one would satisfy it. And you've already conceded here that the one didn't. No, I'm not. I'm saying that when you have an officer identify himself as saying I'm conducting a drug investigation, on top of and in conjunction with retaining the travel documents, a seizure has occurred. Your honor, I see that I'm I have 15 seconds left, I'd like to reserve some time for rebuttal. But for those reasons, and the reasons that we've stated in our briefs, we'd be asking your honors to reverse the district court's decision below and remand for further proceedings. Thank you very much, Mr. Jacobs. Good afternoon, may it please the court. My name is Tanner Jacobs on behalf of the United States of America. Turning to the first point that your honor brought up about when consent was actually given. Based upon the record, it appears that consent was given simultaneously with the holding of those documents. And before anything had been done that would suggest to a person that they were not free to leave. In other words, had he asked for the documents back, it's clear to see that a reasonable person would have expected that those documents would have been returned. This case obviously brings us a very interesting concept of when does a consensual encounter more for evolved into an investigatory stop. And in this case, the defense counsel has clearly argued that it doesn't morph into that stop until the retention of documents at some time. This court has held in both Williams and even in Tyler, that it's more the lengthy holding of those documents that we're actually concerned with. In this after having looked at, checked the license, and spoken to Mr. Ahmed before he even gets those documents and then asked for consent. That's the time from that we're really talking about in that defense counsel pushing somehow now evolves into that investigative stop. We look at everything that happened, though, it's clear to see that Deputy was in fact engaged in a consensual encounter. first, he drives up to them, not blocking their RV and not stopping them from where they're going, drives up next to it approximately 10 to 15 feet. He asked that Mr. Ahmed and Mr. Osama come over to him. Mr. Osama apparently believes that this is not something that is obligatory, because he gets back onto the RV. Mr. Ahmed actually does come up to the car and what and this is the biggest part here, what the people at loves travel stop. That's in that's on page 53 of the transcript. He specifically states that. And it's this court's time and time again suggestion that an instruction like that is not one that would put someone not at ease. In other words, that it would tell someone that they are now under investigation, which when you look at Tyler and you look at Cordell, it's not an or even though defense counsel likes to push that one statement and Tyler, it's not an or they say or slash and what they really mean, if you look at every one of the cases that Tyler sites to, it's an end, there has to be something more than just simply the holding of a document. Because other than that, there's no reason to believe that that person wouldn't get those documents back. And Cordell, as your honor correctly pointed out, they took those documents and then basically forced or forced him to understand that he was in fact, the target of that and Tyler, they took those documents, retain them told him that he wasn't going anywhere. Although do you agree that it could be an or given the length of time that if he had taken the rental agreement and the license and held on to them for 20 minutes, wouldn't that alone be sufficient to turn it into an investigatory stop? I think that it gets closer, your honor. But I think that we're still in that area where if someone asked for the documents back, and they say, Sure, take them after a certain amount of time because of what was happening in the interim in this case, that it still would not have morphed into an investigative stop, because everything after the taking of those documents remains consensual. He asked Mr. Ahmed, if he'll go and get Mr. Osama. He does. So it's not an it's not a command. Well, he asked Mr. Osama after telling both Mr. Ahmed, and Mr. Osama, that they were free to leave. He tells them that they're both free to leave, but that he'd like to ask them some questions, and they both agree to do so. So what we have is everyone simply agreeing to continue this encounter. The deputy obviously is asking questions and the two individuals that he's asking the questions of don't attempt to leave, don't ask to get back on the air B, don't say, Hey, you know, we've got to be somewhere. What they say is just sure. Yeah, we can answer some questions for you. And then Mr. Osama is put in the back of the police car because he's cold, not because he's being held against his will. This is one of those times simply where the officer was being kind, looked at Mr. Osama, saw that he was shaking and thought to himself, he looks cold, he'd probably like to sit in a warm police car rather than to stand outside while asking these questions. And that's exactly what Mr. Osama did, acquiescing again, to not a command, but a suggestion by the officer. So again, this is a totality test, as defense counsel mentioned. And when you look at the totality and the factors elicited in both Tyler and in Holly, which is from 2019, this court is time and time again said that you look at all of these factors, not simply one or the other. I'm sure the holding of documents can be a specific factor that this court can pinpoint. But in this case, both the consent and the holding of documents happen simultaneously. And there's nothing to suggest that these documents wouldn't be returned. It would tell a reasonable person in that scenario that I'm not free to leave or not free to go. If we turn to whether or not if this court initially decides, however, that even based on the totality of the circumstances and those factors, that it does morph into an investigatory stop, then there is reasonable suspicion that the officer was able to obtain before that holding of the documents or the lengthy holding of those documents take place. Because really what we're talking about is that this would have had to have morphed at the time after consent is given, because it's clear that it doesn't happen within that single second that he asked one more question. Because asking for consent doesn't morph it into an investigatory stop. Running the background check doesn't morph it into an investigatory stop. So when those are done simultaneously, it would be very difficult to say that that's exactly when it evolved. So if we're saying that it evolved, it would have to have evolved several minutes afterwards. And so by that time, the officer has reasonable suspicion. First of all, right as he makes initial contact, when I say makes initial contact, when he first sees this vehicle, he notices that the license plate is dirty. He can't read it. So he gets behind that vehicle. That vehicle then turns off about half a mile ahead very quickly. I mean, this is a vehicle that as soon as the officer gets behind is taking that exit. It's only a half a mile. They're on I-72. It's not a 30 mile an hour window. So they're getting off at that ramp. He notices that they don't put on their turn signal. He could have pulled them over right then and there for a traffic violation. He doesn't. He then follows them to the Love's gas station. He gets out, never talks to them, gets back in his car, and then he runs the registration. When he runs that registration, he notices that one, it's not the registration of these two individuals. It's clearly of two elderly white people who were born in the 1940s. And it doesn't match the description of these two. Second, it's not by a rental company. It's owned by private individuals. Then he finds out when he actually speaks with them. Well, I'm sorry, backing up. After that happens, after he runs the plate, he gets more information, not from them, but from someone who actually comes out in the cold on October 31st. So we're talking about it. It's obviously cold enough that Mr. Osama doesn't want to stand out there and talk to the officer. This employee, a named employee, in fact, in the testimony, comes out and speaks to the officer at his car door and tells him specifically, there are these two guys in there. They look, they're acting really suspicious. They keep passing by this window and they keep looking at you specifically. I really believe that based on their actions, they're trying to wait you out. They don't want to come out while you're here. Now, that would give any officer suspicion. That would force any officer to think there's something more here that I don't know. And so then he pulls up and he asks if they'd like to speak with him. They do. Mr. Ahmed does. And he finds out something incredibly peculiar. And that's that this individual first tells him that they're going from Houston to Ohio. He doesn't say anything about Idaho. He says that they're traveling from Houston to Ohio. And then when he's pushed, it's only after the officer pushes him on that point and says, wait a minute, the license plates from Idaho, that he says, oh, well, myself, my two children and my cousin flew from Houston to Idaho to rent this vehicle to then drive it all the way to Ohio. When he's asked why, the reason isn't something like it is in Rodriguez-Escuela or the other 10 circuit cases cited by defense counsel, whereas, well, you know, we're going to go to the scenic route. I'm picking my father up. I'm driving him back. I've got a plan for my boyfriend where we're going to I'm surprising him with a trip to New York. No, it's because it's cheap. That in and of itself, plus all the other factors clearly lend themselves to the understanding that that officer at that time had reasonable suspicion. I see I'm out of time, Your Honors. We would ask that this court affirm the district court's finding that there was, in fact, no investigatory stop at the time of consent or in the alternative that the officer possessed reasonable suspicion. Thank you. Thank you very much, Mr. Bulletin. Yes, Your Honor. Just very briefly. I see I have 13 seconds left. The counsel said that consent was given simultaneously. And if you look at the record on page 28, the question asked is, and after speaking further with Mr. Ahmad and running his driver's license, did you ask him for dot, dot, dot? Did you ask him of anything to do? I asked him for consent to search the RV. That testimony alone shows that he ran it afterwards. He got done with the check, and then he asked him for consent. He did not do this simultaneously. And just briefly on the issue of the trip, it is not the trip itself with no other circumstances of reasonable suspicion. The trip itself cannot amount to reasonable suspicion to stop. There was no tip about an RV carrying drugs. Mr. Ahmad did not act suspiciously in communicating with the trooper. There were not a low amount of luggage. There was not excessive air fresheners. There was nothing other than the trip being odd that indicated that the trip had illicit purposes. And for those reasons and the reasons that we laid out in our brief, we'd be asking Your Honors to reverse the district court decision denying our motion and remand for further proceedings. Thank you. All right. Thank you very much. Our thanks to both counsel. The case is taken under advisement, and that concludes the calendar for today. The court is in recess.